UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAIME B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:25-CV-798 JMB |
| | ) | |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Jaime B. for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-434. *See* 42 U.S.C. 405(g). For the reasons that follow, the court reverses the decision of the Commissioner and remands this matter for further consideration.

## I. Background

Plaintiff was born in 1976. She contends that she became disabled on January 1, 2021,[1] at the age of 44. She alleges—and an Administrative Law Judge (ALJ) found—that she suffers from the severe impairments of rheumatoid arthritis, fibromyalgia, degenerative disc disease of the spine, osteoarthritis of both knees, osteoarthritis of the left shoulder, bicipital tendinitis of the right shoulder, and obesity. (Tr. 40-41.)[2] Nonetheless, after a hearing, the ALJ concluded that Plaintiff was not under a disability, as that term is defined in the Social Security Act, during the period

[1] Initially, Plaintiff alleged an earlier disability onset date, but through her attorney she later amended it.

[2] Though Plaintiff did not allege a mental impairment, the ALJ considered her past diagnoses of anxiety and depression, concluded these conditions did not cause more than minimal limitation in her ability to perform basic mental work activities, and classified them as non-severe. (Tr. 41.)

between her alleged onset date and her date last insured (December 31, 2023). (Tr. 38, 40, 51; *see also* ECF No. 17 at 11.)

Plaintiff has exhausted her administrative remedies. The ALJ's adverse ruling (Tr. 35-56) is the final decision of the Social Security Administration, and it is therefore before the court for review. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c).

## II. Standard of Review and Legal Framework

To be eligible for disability benefits, a plaintiff must prove she is disabled under the Social Security Act. *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992); *accord Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A) (defining "disability"); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The Social Security Administration has established a sequential five-step process for ascertaining a person's disability status. 20 C.F.R. § 404.1520; *see also Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (discussing the process); *Bowen*, 482 U.S. at 140-42 (same).

The court's role on judicial review is to determine whether the final decision of the Administration—in this case, the ALJ's ruling adverse to the claimant—is supported by substantial evidence in the record as a whole. *Ross v. O'Malley*, 92 F.4th 775, 778 (8th Cir. 2024). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)); *accord Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017). Although "the threshold for such evidentiary sufficiency is not high," *Biestek*, 587 U.S. at 103, the court must conduct "a more searching review" than merely asking if substantial supportive evidence exists. *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021) (quoting *Tilley*

*v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009)). The court must consider both evidence that supports and evidence that "fairly detracts" from the ALJ's decision. *Id.*; *accord Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

The reviewing court will not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. *Bonham v. Bisignano*, 177 F.4th 934, 940 (8th Cir. 2026). A decision does not fall outside that zone simply because the reviewing court might disagree with it. *Id.*; *accord McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome"); *see also Brand v. Sec. of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980) (setting out factors a reviewing court considers when reviewing the sufficiency of the evidence underlying an ALJ's decision).

Nonetheless, the court is bound to review the decision on the bases the ALJ gave therein. *See Stacey S. v. Saul,* No. 18-CV-3358-ADM/WNL, 2020 WL 2441430, at *15 (D. Minn. Jan. 30, 2020), R&R adopted, 2020 WL 1271163 (D. Minn. Mar. 17, 2020) ("It is not the role of this Court to speculate on the reasons that might have supported the ALJ's decision or supply a reasoned basis for that decision that the ALJ never gave."); *see also Lucus v. Saul*, 960 F.3d 1066, 1070 (8th Cir. 2020) (rejecting Commissioner's post-hoc explanation for ALJ's ruling and stating "we will not affirm on this basis, as the ALJ made no such findings"). The court cannot "fill in the gaps" for an ALJ that fails to comply with an applicable regulation. *Bradley v. Kijakazi*, No. 1:22-CV-19-SNLJ, 2022 WL 4482407, at *4 (E.D. Mo. Sept. 27, 2022) (quoting *Lucus*, 960 F.3d at 1069); *see also Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon

which an administrative order must be judged are those upon which the record discloses that its action was based.").

With these standards in mind, the court will turn to the ALJ's decision in this case and the arguments advanced by the parties.

## III. Discussion

In a June 2024 opinion following a telephone hearing, the ALJ followed the five-step disability determination procedure and ultimately concluded that Plaintiff was not under a disability during her insured period. (Tr. 51; *see also* 42 U.S.C. § 423(d)(1)(A).) In accordance with 20 C.F.R. § 404.1520c, he considered Plaintiff's physical impairments, including rheumatoid arthritis and fibromyalgia, and classified them as "severe." (Tr. 40-41.)

He nonetheless found that Plaintiff retained "residual functional capacity" (RFC) to perform sedentary work with some modifications: only occasional stooping, kneeling, crouching, and crawling; only frequent overhead reaching, handling, and fingering; and limited or no exposure to certain environmental hazards. (Tr. 44; *see also* 20 C.F.R. § 404.1567(a) (defining "sedentary work").) He found there were unskilled jobs (including table worker, semiconductor bonder, and label pinker) available in the national economy that Plaintiff could have worked. (Tr. 50.) Therefore, the ALJ concluded, she had not been under a disability. *See Pearsall*, 274 F.3d at 1217 (explaining that the claimant bears the burden of proving her RFC before the burden shifts to the Commissioner to establish that the claimant's RFC permits her "to perform a significant number of jobs within the national economy," meaning that she is not under a disability).

Plaintiff argues that, for multiple reasons, ALJ's decision is not supported by substantial evidence in the record as a whole. At their base, her arguments center on (1) the ALJ's adoption of two "prior administrative medical findings" (PAMFs) from state agency medical consultants

and (2) the ALJ's failure to fully credit Plaintiff's subjective complaints of pain, malaise, stiffness, fatigue, and disabling brain fog stemming from her rheumatoid arthritis and fibromyalgia. For his part, the Commissioner responds that—even if another result might also be supported—the ALJ properly evaluated both the PAMFs and Plaintiff's subjective complaints in light of the whole record and the decision should therefore be affirmed.

***A. The ALJ failed to fully comply with 20 C.F.R. § 404.1520c***

The ALJ considered the opinions of four state agency consultants: two psychologists (Dr. Steven Akeson and Dr. Gretchen Brandhorst) and two medical doctors (rheumatologist Dr. Bhajanjit Bal and family medicine physician Dr. Clifford Costley).[3] Each of the consultants evaluated Plaintiff's application and opined on her capacity for work between April and September 2022, following her November 2021 request for disability insurance benefits.

Dr. Bal completed an administrative finding during the Commissioner's initial consideration of Plaintiff's request for benefits. In a PAMF dated May 17, 2022, Dr. Bal summarized Plaintiff's description of her activities of daily living (ADL) from her application for benefits along with her medical records through April 2022, including her encounters with her treating providers and radiographic imaging. He considered her subjective complaints of pain, malaise, fatigue, and weakness, as well as her allegations of issues understanding, remembering, concentrating, and persisting, and found them "partially consistent" with the medical evidence. (Tr. 194-99 (stating that Plaintiff's complaints "appear[ed] more limiting than evidence in file").) Dr. Bal opined that Plaintiff could do sedentary work (sitting for up to six hours and standing and walking for up to two hours of a normal eight-hour shift, with normal breaks) with additional (1)

[3] Plaintiff did not allege a mental impairment and does not take issue with the ALJ's discussion of the state agency psychologists' findings, so the court will focus on the medical doctors, supplemented as necessary to discuss Plaintiff's allegations about brain fog.

postural limitations "given based on claimant's chronic RA and Fibromyalgia to prevent further pain and injury," including only occasional balancing, stooping, kneeling, crouching, crawling, and climbing stairs, and never climbing ladders; (2) manipulative limitations "in both extremities based on claimant's chronic RA," including only "frequent" overhead reaching and fine manipulation (fingering); and (3) environmental limitations, including restrictions on exposure to extreme cold, extreme heat, wetness, vibration, and hazards. (Tr. 195-96.)

Plaintiff's application for benefits was denied after initial consideration. Upon reconsideration, family physician Dr. Costley was also called upon to issue an administrative finding. In a PAMF signed September 12, 2022, Dr. Costley found that the "totality of evidence support[ed that] claimant has the capacity to sustain work related tasks with limitations as indicated in this RFC." (Tr. 204.) He referenced an updated function report[4] that Plaintiff had submitted in July 2022 (Tr. 392-99), as well as medical records through August 2022, and affirmed Plaintiff's modified-sedentary RFC. (Tr. 206-09.)

Plaintiff argues the ALJ adopted the PAMFs from Drs. Bal and Costley without adequately explaining how he had assessed their "supportability" and "consistency," as required by law. *See* 20 C.F.R. § 404.1520c(c)(1) and (2). Although there are myriad medical records supplied by Plaintiff's treaters, it is only the state agency medical consultants who contributed opinions about her capacity for work. The ALJ found their opinions "well-supported by citation to specific

[4] Dr. Costley summarized Plaintiff's ADL upon reconsideration as follows: "Feels unwell like sick with the flu. Never knows how she will feel each day. Difficulty moving due to being so tired. Wakes up, makes coffee, lets the dogs out, gets some coffee, sits outside on the porch. Then comes in. Brushes hair and teeth. Feeds and waters dogs. Gets dressed. Somedays goes to the doctor or rides to town with Dad, eats lunch[,] sits on porch and reads or talks on phone, somedays takes naps. Somedays stays in bed most of the day. Daughter and grandson help with pets. Doesn't bathe on bad days. Daughter brushes her hair when having shoulder pain. Doesn't shave often. Able to prepare simple meals. Does laundry. Drives. Shops online. Reads. Watches tv. Goes to town a couple times a week unless having a bad day. Has stopped going to church. Doesn't go out or to family or friends['] homes. Has canceled so much doesn't get invited to things very often. Can lift 10lbs. Difficulty squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks and using hands. Can walk about 50 feet before stopping to rest." (Tr. 204.)

evidence in the record." (Tr. 48.) Plaintiff contends that this reference is "primarily … conclusory" and that the ALJ did not do enough under the regulation to articulate what other evidence supports, and is consistent with, those opinions. (ECF No. 17 at 4.) The court agrees.

Since 2017, the governing regulation has required ALJs to assess and articulate how persuasive they find each medical source, including state agency consultants. *See* 20 C.F.R. § 404.1520c. The two most important factors—which must be explicitly discussed—are supportability and consistency.[5] *Id.*; *see also Lerchaichanakul v. Kijakazi*, No. 4:22-CV-1002 SRW, 2023 WL 5128207, at *3 (E.D. Mo. Aug. 10, 2023) ("The rules make clear that supportability and consistency are the most important factors; therefore, an ALJ must explain how he or she considered these factors in the decision.").

"Supportability" measures whether an opinion is supported by relevant objective medical evidence and appropriate explanation. 20 C.F.R. § 404.1520c(c)(1) ("[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support [their opinions]…, the more persuasive [they] will be"). "Consistency" weighs whether an opinion is consistent with other evidence in the record. 20 C.F.R. § 404.1520c(c)(2) ("[t]he more consistent a medical opinion[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive [it] will be").

"Supportability" and "consistency" are not "magic words" the ALJ must employ, "but it must be clear they were addressed." *Oleary v. Dudek*, No. 4:23-CV-725-MTS, 2025 WL 962313, *3 (E.D. Mo. March 31, 2025) (quoting *Svendsen v. Kijakazi*, No. 1:21-CV-1029-CBK, 2022 WL

---

[5] An ALJ may also consider other factors in determining whether a medical source is persuasive, including the source's relationship with the claimant, type or degree of specialization, and other factors, including familiarity with other evidence and understanding of social security policies. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1–5). An ALJ "may, but [is] not required to, explain how [he] considered" these additional factors. 20 C.F.R. § 404.1520c(b)(2). The ALJ's reasoning must be "clear enough to allow for appropriate judicial review." *Grindley*, 9 F.4th at 631.

2753163, at *8 (D.S.D. July 14, 2022)); *see also Lucus*, 960 F.3d at 1069 (explaining that "while an ALJ's decision need not be exhaustive, boilerplate or blanket statements will not do" (internal quotation marks omitted)). In other words, *some* discussion of supportability and consistency is mandatory. If an ALJ fails to articulate how these factors contributed to his finding on persuasiveness, he "commits legal error." *Bradley v. Kijakazi*, No. 1:22-CV-19-SNLJ, 2022 WL 4482407, at *4 (E.D. Mo. Sept. 27, 2022). The court cannot mine the record for evidence supporting the ALJ's conclusion after the fact. "[I]f the ALJ does not explain [his] review of the consistency and supportability factors, the Court must reverse." *Abraham v. Kijakazi*, No. 1:22-CV-152-SNLJ, 2023 WL 3948816, at *4 (E.D. Mo. June 12, 2023); *see also Lucus*, 960 F.3d at 1070 ("The failure to comply with SSA regulations is more than a drafting issue, it is legal error."); *Bonnett v. Kijakazi*, 859 Fed. App'x 19, 20 (8th Cir. 2021) (unpublished) (per curium) (reversing and remanding because "while the ALJ adequately evaluated the supportability of [a doctor's] opinion, she did not address whether his opinion was consistent with the other evidence of record, as required by the applicable regulation").

In considering the opinions of consultants Drs. Bal and Costley, the ALJ first described what they had found with respect to Plaintiff's RFC: that she could do sedentary work, sitting for six hours and standing and/or walking for two hours, with normal breaks, during an eight-hour workday, with some postural, manipulative, and environmental limitations. (Tr. 48.) The ALJ "was persuaded by" these determinations and adopted similar work limitations when assessing Plaintiff's RFC. He concluded that the PAMFs "account[ed] for the claimant's 'chronic rheumatoid arthritis and fibromyalgia' and pain and [we]re well-supported by citations to specific evidence in the record." (*Id.*) As examples, he cited radiographic imaging showing "moderate" osteoarthritis across three areas of the right knee and osteoarthritis of the left knee, "mild" in two

areas and "severe" in a third, as well as additional imaging of the spine showing mild spondylosis in several areas. (*Id.* 48, citing *id.* 455.) He also concluded that the determinations were "supported by the generally benign physical examination findings during this period," which showed that Plaintiff's "cranial nerves and sensation were grossly intact or normal and all other extremity joints were unremarkable for asymmetry or atrophy of musculature, instability, ligamentous laxity, stiffness, spasms, weakness, or other deformity." (*Id.* 49.) He acknowledged that "the unpredictable onset of fibromyalgia flare-ups and accompanying fatigue and malaise," as well as "the adverse side effects associated with the claimant's long-term drug therapy," justified supplementary environmental limitations. (Tr. 47.)

Plaintiff maintains that the ALJ failed to explain how he assessed consistency in finding the PAMFs persuasive, contrary to the requirements of § 404.1520c, and failed to engage with evidence that was inconsistent with the medical consultants' finding that she retained the capacity to do some sedentary work. She points out that physical examination findings were in fact *not* benign during her insured period. For instance, she points to multiple x-rays and physical exams showing musculoskeletal abnormalities of the spine, knees, shoulder, hips, feet, and hands; tenderness and mild synovitis of certain finger joints; and 18/18 tender points on repeated occasions.[6] (*See, e.g.*, Tr. 459, 623, 832, 839, 846.) Indeed, despite summarizing the medical record from an April 2022 rheumatology appointment that showed multiple "abnormal" findings consistent with functional impairment, including widespread tenderness in the shoulders and along the spine; joint pain; "tingling and sensory change"; worsening sicca; and mild inflammation,

---

[6] There are 18 specific, symmetrical "tender points" on the body that may become painful in response to even mild pressure in people who suffer from fibromyalgia. Under SSR ("Social Security Ruling") 12-2p, Evaluation of Fibromyalgia, 77 Fed. Reg. 43640, 43644 (July 25, 2012), a person must have—among other criteria—at least 11 tender points, including some on each side of the body and some above and below the waist, for the Commissioner to find that she has a medically determinable impairment of fibromyalgia.

swelling, and tenderness to palpation of certain finger joints, the ALJ concluded that "the record is insufficient to support the extent of limitations alleged or preclude the claimant from performing work at the sedentary exertional level." (Tr. 46.) Because he did not address the consistency of the PAMFs with the record evidence, he did not explain why he found their assessment persuasive despite this inconsistency with the record. *See* 20 C.F.R. § 404.1520c(c)(2).

In short, the ALJ did not explain whether or how the PAMFs were consistent with longitudinal evidence from Plaintiff's treatment records, as well as her subjective reports about her symptoms and daily activities. To be sure, the ALJ was "not required to explicitly reconcile every conflicting shred of medical evidence." *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022). Further, the ALJ was within his authority to adopt the findings of the state agency medical consultants. *See Bowers v. Kijakazi*, 40 F.4th 872, 875–76 (8th Cir. 2022); *Morton v. Saul*, No. 2:19-CV-92 RLW, 2021 WL 307552, at *8 (E.D. Mo. Jan. 29, 2021). However, the ALJ simply did not fulfill his obligation to articulate "how [he] considered the supportability and consistency factors" as required by 20 C.F.R. § 404.1520c(b)(2), which constitutes legal error and requires remand. *See Schnegelberger v. Kijakazi*, No. 4:22-CV-781 RHH, 2023 WL 8599486, at *9 (E.D. Mo. Dec. 12, 2023) ("An ALJ's failure to address either the consistency or supportability factor in assessing the persuasiveness of a medical opinion requires reversal").

### *B. The ALJ appropriately considered evidence post-dating the PAMFs*

Plaintiff also contends that the ALJ did not explicitly consider the PAMFs in light of the rest of the record and did not address the combined effects of her impairments. Because they reached their conclusions in 2022, the state agency medical consultants were unable to consider what she calls "later evidence documenting worsening knee osteoarthritis, persistent synovitis, weakness, crepitus, and fibromyalgia flares." (ECF No. 17 at 6.) The PAMFs were necessarily

snapshots-in-time, and Plaintiff maintains that the ALJ had an obligation to consider the longitudinal evidence, given the unstable nature of her conditions. *See* SSR 12-2p ("For a person with [fibromyalgia (FM)], we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'"); *id.* ("the symptoms and signs of FM may vary in severity over time and may even be absent on some days"); *see also Williams v. Saul*, No. 2:19-CV-88 RLW, 2021 WL 1222770, at *13 (E.D. Mo. Mar. 31, 2021) (pointing out that, under SSR 12-2p, the Commissioner should "tak[e] into account the fact that that pain symptoms and fatigue can come and go and may even be absent" and "tak[e] a longitudinal view of the record").

Contrary to Plaintiff's argument, the ALJ did consider evidence post-dating the PAMFs. For instance, he cited medical records from encounters Plaintiff had with her treating rheumatologist on January 9, 2023; February 13, 2023; June 12, 2023, July 17, 2023; August 28, 2023; and November 27, 2023 (Tr. 46-49, citing Tr. 803-47 (Exhibit C14F/8-52).) He also cited records of Plaintiff's visits with the office of her primary care provider on November 2, 2022; May 4, 2023; May 25, 2023; and September 18, 2023 (Tr. 46-49, citing Tr. 736, 743, 745, 769, 770 (Exhibit C13F/16, 22, 25, 49, and 50).) He reviewed imaging from January 9, 2023 (Tr. 63) and considered Plaintiff's 2024 hearing testimony (Tr. 41-42, 45, 47).

An ALJ may make an RFC finding consistent with prior administrative medical findings despite the fact that they were rendered earlier in the administrative process, where, as here, the ALJ evaluates the reliability of the earlier medical opinions in light of updated clinical findings. *See Jones v. Kijakazi*, No. 1:23-CV-00016-SNLJ, 2024 WL 3509498, at *4 (E.D. Mo. July 23, 2024) (rejecting the plaintiff's argument that the earlier medical opinions were "stale," and emphasizing the ALJ's duty to consider "all relevant evidence in the record"; "the earlier medical

opinions, though insufficient insofar as they do not account for the entirety of plaintiff's medical situation, nonetheless are relevant and valuable data points for determining plaintiff's RFC"); *see also Walker v. Kijakazi*, No. 6:21-CV-3235-NKL, 2022 WL 3036639, at *6 (W.D. Mo. Aug. 1, 2022) ("[A]n ALJ can rely on the opinion of a state agency medical consultant who did not have access to all the records, so long as the ALJ conducts an independent review of the evidence and takes into account portions of the record the consultant had not considered.").

These records contain some evidence supporting Plaintiff's allegation of disability. For instance, on January 9, 2023, Plaintiff complained to Dr. Aslam of having "increased overall pain and stiffness" and a review of systems showed fatigue, malaise, and joint pain. Plaintiff had 18/18 tender points and mild synovitis of certain finger joints. (Tr. 837-39; *see also* Tr. 829 (Plaintiff was "stiff and achy"), Tr. 810 ("fibromyalgia getting[]a little worse").) Although there is no Medical Source Statement from Plaintiff's treaters, there are records indicating an ongoing relationship with her primary care physician and treating rheumatologist that might support greater functional limitations. *See* 20 C.F.R. § 404.1520c(b)(c)(3) (stating that the Commissioner will consider a medical source's relationship with the claimant, including the length, purpose, and extent of the treatment relationship and frequency of examinations, and that "[a] medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder").

Upon remand, the ALJ should articulate whether the PAMFs are consistent with the record as a whole, including the evidence that post-dates the consultants' evaluation of Plaintiff's medical records. The court notes, however, that records after 2023 are only relevant insofar as they shed light on impairments that existed during the insured period. *See Bannister v. Astrue*, 730 F. Supp. 2d 946, 951 (S.D. Iowa 2010) (holding that an ALJ need not consider records postdating the

insured period "unless they reflect that [the claimaint's] disability existed between her alleged onset date and date last insured"); *see also Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). The ALJ was under no obligation to consider the evidence in the record dating from 2024. (*See* Tr. 713-30, 796-802.)

### *C. The ALJ failed to consider Plaintiff's subjective complaints in light of the whole record*

The determination of a claimant's residual functional capacity includes an assessment of her credibility regarding any subjective complaints she makes about pain, fatigue, and other symptoms. If an ALJ does not fully credit a claimant's complaints, he is "required to make an express credibility determination explaining why." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000); *see also Lewis v. Saul*, No. 6:20-CV-03195-NKL, 2021 WL 943108, at *4 (W.D. Mo. Mar. 12, 2021) ("[G]iven the nature of fibromyalgia, where the subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important.") (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 675, 681 (6th Cir. 2009)).

In assessing a claimant's credibility, the ALJ considers how consistent her complaints are with what are known as the *Polaski* factors: the claimant's prior work record; her current daily activities; the duration, frequency, and intensity of any pain she alleges; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of any medications; and her functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* 20 C.F.R. § 404.1529(c)(3); *Hahn v. Kijakazi*, No. 1:21-CV-17-SPM, 2022 WL 4534420, at *6 (E.D. Mo. Sept. 28, 2022) (citations omitted); *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (remarking that an ALJ who conducts his analysis under 20 C.F.R. § 404.1529 need not expressly cite the *Polaski* factors because the regulation mirrors them).

The ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms. To do so, he must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 82 Fed. Reg. 49,462, 49,464 (Oct. 25, 2017). The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at 49467.

A court defers to an ALJ's credibility determinations if they are "supported by good reasons and substantial evidence." *Swink v. Saul*, 931 F.3d 765, 771 (8th Cir. 2019); *see also Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010). Although an ALJ must consider the *Polaski* factors in assessing the claimant's credibility, he need not discuss each factor "as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Hahn*, 2022 WL 4534420, at *6 (quotation marks omitted); *see also Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) ("an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary"). An ALJ may discount subjective complaints based on inconsistencies in the record as a whole, *Guilliams v. Barnhart*, 393 F.3d 798, 801-02 (8th Cir. 2005); *Polaski*, 739 F.3d at 1322; *see also* 20 C.F.R. § 404.1529(c)(4), but he may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. *Halverson*, 600 F.3d at 931–32 (citing *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008)).

Here, the ALJ stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 45.) Nonetheless, he found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*) He concluded that Plaintiff's impairments "resulted in some degree of functional limitation but not to the extent alleged." (*Id.*) Ultimately, the ALJ wrote, although Plaintiff "*may* have experienced greater functional limitations than might have been expected from her other physical impairments, the record is insufficient to support any additional limitations that would preclude work at the sedentary exertional level, prior to the date last insured." (Tr. 47.)

Despite his reference to "the medical evidence and other evidence," the ALJ went on to rely exclusively on a perceived lack of objective medical evidence to partially discredit Plaintiff's complaints of pain and other symptoms. (*See generally* Tr. 45-49.) Plaintiff argues that instead of fully crediting her reports, the ALJ erroneously created a standard that demanded objective medical evidence of her pain and fatigue. This error was acute, according to Plaintiff, because her severe impairments of fibromyalgia and inflammatory arthritis are "well recognized as producing symptoms that are not reliably corroborated by objective testing." (*Id.*)

Plaintiff is correct that a lack of objective clinical signs is not unusual in patients with fibromyalgia, and therefore, an overreliance on corroborative objective testing is not appropriate. *See Clarambeau v. Saul*, No. 4:19-CV-04170-VLD, 2020 WL 3097771, at *24 (D.S.D. June 11, 2020) ("[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities") (quoting Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005)); *see also Tilley*, 580 F.3d at 681 (remarking that the symptoms of

fibromyalgia "are entirely subjective"); *Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (commenting that an ALJ who required fibromyalgia pains to be "substantiated by objective medical testing" had "misunderstood" that condition); *Forehand v. Barnhart*, 364 F.3d 984, 987-88 (8th Cir. 2004)) ("Fibromyalgia is a chronic condition... for which no confirming diagnostic tests exist."); *Rogers*, 486 F.3d at 250 ("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely on objective evidence are not particularly relevant").

Here, though the ALJ briefly cited 20 C.F.R. § 404.1529, his decision does not reflect any consideration of the *Polaski* factors. He did not discuss Plaintiff's prior work record, which included thirteen years as a school custodian until termination from absenteeism following her rheumatoid arthritis diagnosis and a subsequent unsuccessful attempt to maintain employment at Walmart (*see* Tr. 135-37); her highly curtailed daily activities as described above (*see* n.4 and Tr. 138-48); precipitating and aggravating factors that affected how her rheumatoid arthritis and fibromyalgia manifested on any given day, including Plaintiff's testimony about needing to spend days in bed with "nothing but pain" after pushing herself to do normal activity; the dosage or effectiveness of her medications, which included prednisone, which caused thrush, as well as gabapentin, hydroxychloroquine, and methotrexate, the latter of which caused migraines, stomach upset, and swelling (*see* Tr. 142, 840)[7]; or the functional restrictions she had as a result of the variable nature of her conditions. (Tr. 144.)

---

[7] The record reflects that Plaintiff had to make choices amongst imperfect treatment options. For instance, a note from her treating rheumatologist Dr. Aslam states that she was on a 12.5 milligram dose of methotrexate for rheumatoid arthritis. She had "tried [a] higher dose in the past but had stomach upset." (Tr. 840.) The "tenderness and [s]welling of joints of hands" caused the doctor to recommend increasing the dosage and then switching medications if she was "not able to tolerate" the side effects. Although the ALJ included environmental limitations in Plaintiff's RFC because of "the adverse side effects associated with the claimant's long-term drug therapy," he did not discuss their impact on his evaluation of her subjective complaints.

The ALJ stated that he "considered the claimant's statements that her [] arthritic-type pain symptoms have caused difficulties reaching on a repetitive basis and grasping items" and commented that "physical examination findings during this period noting there was mild inflammation of the MIP [middle interphalangeal] and PIP [proximal interphalangeal] joints of both hands" contributed to his modified-sedentary RFC assessment. (Tr. 47, citing Tr. 620 (Exhibit C6F/4), 770 (Exhibit C13F/50), and 133-163 (Hearing Testimony).) Because of that evidence, the ALJ said, "the residual functional capacity included a restriction to less than a full range of work at the sedentary exertional level." (Tr. 47.) Nonetheless, he stated, "the record does not document any abnormal . . . findings indicating the claimant's rheumatoid arthritis resulted in and/or otherwise precluded the claimant from sustaining and completing work-related activities involving fine and gross movements such as picking, pinching, handling, grasping, lifting, carrying, pushing, and pulling." (*Id.* at 44.) The ALJ did not explain whether or not he had credited Plaintiff's testimony about how she accommodated her pain and fatigue at home, particularly with regard to her hands: among other things, stopping chores after 15-20 minutes and depending on family members to complete them; using a wrist brace and compression gloves; wearing solely slip-ons because she could no longer bend or tie shoes; getting her hair cut shorter because brushing long hair caused pain; and having all the door handles in her home changed out so she could grasp them better. (Tr. 145-48.) She testified that if she cut an "onion and cucumber and the lettuce" for a salad, her hands would still be sore the next day. (Tr. 145.) She also stated that, recently, she had had a good day and tried to move branches in the yard with her family, but afterward she "was in so much pain" that "it was probably about four days of just back hurting, shoulders hurting, not doing anything, and the brain fog starts whenever that happens." (Tr. 151-52.) Plaintiff's testimony constitutes some record evidence of limitation in fine and gross movements. The ALJ was free to

discredit Plaintiff's descriptions of her pain, but not by relying solely on a lack of objective evidence to substantiate them. *See* SSR 16-3p, 2017 WL 5180304, at *5.

The ALJ also remarked that "the claimant's characterization regarding the frequency, intensity, and overall debilitating and/or disrupting nature of her mental fogginess and/or 'brain fog,' swelling of her hands and 'dropping things all the time' as alleged, are inconsistent with her own statements and treatment history during this period." (Tr. 46.) At the hearing, the ALJ had asked Plaintiff to clarify what she meant about "dropping things all the time," stating, "I'm going to guess you really didn't mean every time you try and hold something, you drop." Plaintiff responded "no," that it was "not every time I hold something." She gave an example of dropping a container of sugar, which her daughter had had to clean up for her. When Plaintiff tried to move the sugar from its container to a Ziplock bag, she dropped it again. (Tr. 154-55.) In addition, Plaintiff described her brain fog as "trying to swim through a bowl of Jell-O" and being "in slow mode," and her fatigue as "feel[ing] like you're pulling yourself around, like . . . it's sandbags, and it's just hard to . . . move." She stated that she could sit for 20 or 30 minutes at a time, and if she sat longer, it would be "a painful, sluggish day." (Tr. 145.) In light of this testimony, it is not clear what statements Plaintiff made that the ALJ found inconsistent with her subjective complaints. *See* SSR 16-3p, at 49467 (ALJ's decision "must contain specific reasons" for discounting her subjective symptoms); *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003) (holding that "in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity"); *see also Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

Upon review of the evidence, medical records from Plaintiff's healthcare providers demonstrate that she presented a consistent narrative of subjective complaints of joint pain from

her diagnosed conditions of rheumatoid arthritis and fibromyalgia, and that her providers treated her accordingly. *See, e.g.*, Tr. 441, 450, 457, 464, 469, 471, 474, 486, 590, 596, 601, 619, 621, 670, 707, 738, 770, 806, 813, 819, 826, 832, 837, 839 (consistent complaints of joint pain to treating providers); *Brosnahan*, 336 F.3d at 678 ("Brosnahan's testimony and reports to the SSA are supported by objective medical evidence of fibromyalgia—consistent trigger-point findings[8]—and by her consistent complaints during her relatively frequent physicians' visits of variable and unpredictable pain, stiffness, fatigue, and ability to function."); *see Outour v. Saul*, No. 4:19-CV-04119-VLD, 2020 WL 1663358, at *30 (D.S.D. Apr. 3, 2020) (remanding for further consideration where ALJ discounted fibromyalgia claimant's subjective statements concerning pain and fatigue based on "essentially normal physical examinations" and commenting that "the ALJ misunderstood [claimant's] fibromyalgia and as a result, it rejected its associated limitations which may have been necessary in her RFC"); *Moraine v. Social Sec. Admin.*, 695 F. Supp. 2d 925, 960 (D. Minn. 2010) (holding that the ALJ failed to explain how normal motor strength and range of motion related in any meaningful way to the claimant's symptoms of fibromyalgia); *Lewis*, 2021 WL 943108, at *3 (remanding where "[m]any of the records relied on by the ALJ are notes from appointments in which [the claimant] appeared alert and had good range of motion, but the purpose of the visits were to discuss her ongoing symptomology" from fibromyalgia, which included pain and fatigue, and "[t]he ALJ did not specifically explain how the listed objective findings are inconsistent with [the claimant's] reports of pain and limitations").

[8] The *Brosnahan* court defines "trigger points" the way "tender points" are identified in SSR 12-2p. The terms are often used interchangeably. Here, like in *Brosnahan*, Plaintiff had consistent tender-point findings before and during her insured period. *See* Tr. 513 (June 8, 2020), Tr. 497 (September 28, 2020), Tr. 459 (June 28, 2021), Tr. 671, 846 (August 8, 2022), Tr. 839 (January 9, 2023), Tr. 832 (February 13, 2023). In *Brosnahan*, the ALJ had found the plaintiff's complaints inconsistent with the "degree of medical treatment required." The court pointed out that the plaintiff had "received treatments recommended by [American College of Rheumatologists] for fibromyalgia" and held that the ALJ's rationale was unsupported by the record.

Though Plaintiff did not allege a mental impairment, the ALJ nonetheless considered her previously diagnosed anxiety and depression and classified them as non-severe. (Tr. 41.) *See* 20 C.F.R. § 404.1523(c) (explaining that the Commissioner considers all impairments, regardless of their severity level, in determining disability). The ALJ evaluated the "four broad functional areas" of mental capacity and determined that Plaintiff had "mild limitation" in each area: (1) understanding, remembering, or applying information; (2) in interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. In so doing, he found Plaintiff's mental impairments slightly more limiting than the two state agency psychological consultants, who had opined that Plaintiff had no limitation in the areas of interacting with others or adapting or managing oneself. (Tr. 41-42.)

Although fibromyalgia is classified as a physical impairment, SSR 12-2p recognizes it may affect a person's mental state. *See* SSR 12-2p, 43642 (listing as symptoms or signs of the condition "fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, [and] anxiety disorder"). In accordance with SSR 12-2p, the ALJ considered Plaintiff's subjective complaints about brain fog, stating that "[a]t the hearing, the claimant testified that one of the most difficult[] symptoms she experienced along with her fibromyalgia was the mental fogginess and/or 'brain fog' and further mentioned that it was particularly hard to concentrate on such days." (Tr. 41; *see also* Tr. 43 (stating that "in accordance with SSR 12-2p," the ALJ considered whether Plaintiff's fibromyalgia medically equaled a listing alone or in combination).) He contrasted these reports to "mental status examinations [that] lacked significant findings during this period" and treating sources that described aspects of Plaintiff's mental function as "appropriate or normal."

The ALJ is entitled to consider a lack of objective evidence in assessing the credibility of a claimant's subjective complaints. *See Grindley*, 9 F.4th at 628. However, normal mental status

examinations are not necessarily inconsistent with accounts of disabling brain fog. *See* SSR 12-2p, at 43640, 43644; *Ortman v. Saul*, No. 4:19-CV-04049-VLD, 2019 WL 6829207, at *16 (D.S.D. Dec. 13, 2019) ("That [plaintiff] is observed to be 'alert' or 'able to follow commands' during a 30-minute doctor's appointment may not necessarily translate into the same condition during an 8-hour workday, 5 days per week"); *see also Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (remanding where ALJ "erred in relying on his own inferences as to the relevance of the notations 'no acute distress' and 'normal movement of all extremities' when considering medical opinions, where claimant had rheumatoid arthritis and was prescribed medications for severe pain, records noted trigger point and joint pain, and the notations' relevance "in terms of [the plaintiff's] ability to function in the workplace [was] not clear").

The ALJ also discounted Plaintiff's allegations of brain fog because she had "acknowledged that she retained the ability to perform a variety of tasks independently that require attention and concentration including self-care activities (e.g., maintaining her hygiene, grooming and other personal care needs), preparing meals, managing finances, shopping online for food and other necessities, reading, and watching television programs." (Tr. 41-42.) These activities too are not necessarily inconsistent with disabling brain fog that "waxes and wanes." SSR 12-2p, at 43644; *see also Hazel S. v. Kijakazi*, No. 4:22-CV-172 JMB, 2023 WL 4263170, at *6 (E.D. Mo. June 29, 2023); *Brosnahan*, 336 F.3d at 677; *Tilley*, 580 F.3d at 681 (commenting that the "ability to complete light housework and short errands does not mean that [a claimant] has the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful condition in which real people work in the real world") (internal quotation marks omitted).

Here, the ALJ relied exclusively on objective medical evidence as the basis for discrediting Plaintiff's subjective complaints of pain, ignoring the other factors. *See Polaski v. Heckler*, 739

F.2d 1320, 1322 (8th Cir. 1984); *see also* 20 C.F.R. § 404.1529(c)(3). That makes this "the rare case in which the court cannot defer to the ALJ's credibility determination." *Witt v. Colvin*, No. CIV 14-4013, 2015 WL 1257438, at *33 (D.S.D. Mar. 18, 2015). In addition, when explaining why he discredited Plaintiff's description of her brain fog, the ALJ pointed to evidence that is not inherently inconsistent with mental fogginess that comes and goes. *See Lucus*, 960 F.3d at 1069 ("[a]bsent some explanation for finding an inconsistency where none appears to exist, we will not fill in the gaps for the ALJ").

Upon remand, the Commissioner should consider all of Plaintiff's impairments in combination, both severe and nonsevere, and consider her subjective complaints in light of the record as a whole, including both the medical and nonmedical evidence. *See Pearsall*, 274 F.3d at 1218. The Commissioner should ensure that consideration is given to any functional limitations Plaintiff had during the insured period that related to her ability to engage in overhead reaching, handling, and fingering, as well as any limitations that might stem from brain fog or absenteeism. The court notes that the vocational expert testified that a person with the same background as Plaintiff who was limited to 50% use of her hands for fine and gross manipulation throughout a normal workday would not be able to perform the jobs she had previously identified, and that a typical workplace will not excuse absences of more than one, or one partial, day per month.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Upon remand, the Commissioner shall reevaluate the prior administrative medical findings of the state agency medical consultants Drs. Bal and Costley and provide principled reasons in evaluating their persuasiveness, specifically addressing consistency and supportability. The ALJ

shall also reassess Plaintiff's subjective complaints in light of the record as a whole, explaining how he incorporated the associated limitations into the residual functional capacity Plaintiff retained during her insured period or providing reasons for discounting the limitations.

Accordingly, **IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

A separate Judgment shall accompany this Memorandum and Order.

**/s/ *John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of September, 2026.